*CSL*

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF KINGS

The BROOKLYN HISTORIC RAILWAY
ASSOCIATION and ROBERT DIAMOND

                              Plaintiffs,

               -against-

NATIONAL GEOGRAPHIC SOCIETY and NGHT
LLC

                              Defendants.

Index No. 511190/2014

Date purchased 11.26.2014

**SUMMONS**

To the above named Defendants:

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, on Plaintiff's attorney within 30 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Plaintiff designates Kings County as the place of trial. The basis of venue is Plaintiff's place of business.

Dated: Brooklyn, New York
         November 24, 2014

GABRIEL SALEM
*Attorney for Plaintiffs*
2739 Strickland Avenue
Brooklyn, New York 11234
(917) 753- 8511
gabriel@salemandco.com

1

**TO:**

**NATIONAL GEOGRAPHIC SOCIETY**
1145 17TH STREET, N.W.
WASHINGTON, DISTRICT OF COLUMBIA, 20036

**NGHT LLC**
1145 17TH STREET, N.W.
WASHINGTON, DISTRICT OF COLUMBIA, 20036

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

| | |
|---|---|
| THE BROOKLYN HISTORIC RAILWAY ASSOCIATION and ROBERT DIAMOND <br><br> Plaintiffs, <br><br> -against- <br><br> NATIONAL GEOGRAPHIC SOCIETY and NGHT LLC <br> Defendants. | Index No. <u>5\1190\2014</u> <br><br> Date purchased <u>11.26.2014</u> <br><br><br> **VERIFIED COMPLAINT AND JURY DEMAND** |

Plaintiffs, the BROOKLYN HISTORIC RAILWAY ASSOCIATION ("BHRA") and Robert Diamond, by and through their attorney, GABRIEL SALEM, allege for its Complaint against Defendants as follows:

### THE PARTIES

1.    The Plaintiff Brooklyn Historic Railway Association ("BHRA") is a non-profit organization incorporated under the laws of New York and operates a state-chartered museum.

2.    Plaintiff Robert Diamond is Chairperson and founder of BHRA.

3.    Defendant National Geographic Society, is a Washington, D.C. not-for-profit corporation.

4.    NGHT, LLC, is a Delaware limited liability company and upon information and belief, is a subsidiary of National Geographic Society, and does business as National Geographic Television.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the parties and the subject matter pursuant to C.P.L.R. §§ 301 and 302 because all of the parties, at all relevant times, were corporations authorized to transact business in the State of New York and/or conducted continuous and substantial business in the State of New York and this action arises out of events that happened and affects interests within New York.

6.      Venue is proper in this Court pursuant to CPLR § 503 because Plaintiffs' residence and principal place of business is in Kings County.

## BACKGROUND FACTS

7.      Plaintiff Diamond discovered the long forgotten Atlantic Avenue Tunnel[1] in Brooklyn, New York, blocks from this Courthouse.

8.      Plaintiff BHRA operated a state-charted museum in the tunnel for 30-plus years. (See photo of tunnel, Exhibit B, p. 3).

9.      Plaintiff Diamond's extensive research revealed an 1830's steam locomotive buried behind a wall. (See Exhibit A).

10.     Sometime in 2009, the parties had discussions about possibly producing a documentary concerning the locomotive.

11.     By May of 2010, the parties entered into an agreement to produce the documentary.

12.     By September 2010, the project was underway.

13.     As the project progressed, Defendants exhibited a pattern of excluding Plaintiffs from their own project.

---

[1]   *BHRA's website, www.brooklynrail.net, has extensive materials related to the Atlantic Avenue Tunnel, the world's oldest subway tunnel, and its locomotive.*

14.     Plaintiffs thought Defendants were working *with* Plaintiffs on Plaintiffs' expedition.

15.     While Plaintiff Diamond fed Defendants with technical information, Defendants kept Plaintiff in the dark about almost everything.  There was a one-way flow of information.

16.     Further, Defendants even repeated requests that Plaintiffs stop conducting tours in the tunnel.

17.     Out of the blue, in December of 2010, the City of New York's Department of Transportation (DOT) denied Plaintiff BHRA's access to its museum.

18.     Plaintiff filed suit against the City of New York, alleging *inter alia*, an unlawful deprivation of property rights.  (*The Brooklyn Historic Railway Association and Robert Diamond v. The City of New York, et. al.*, Kings County, Index #27426/11).

19.     In response to a motion dismiss by the City of New York, the court found the City had an  "unqualified right to terminate a contract on notice pursuant to an unconditional termination clause *without court inquiry into whether the termination was activated by an ulterior motive.*"[2]

20.     The sudden denial of access to the museum by the City was *perplexing:* Plaintiff BHRA had a perfect safety record in its 30-plus years of operation and never received a single citation or safety violation.

21.     Plaintiff BHRA even submitted in 2009, at the City's request, a safety inspection report completed by professional licensed engineers showing the tunnel was safe.

---

[2] Plaintiffs are respectfully seeking appellate review.

22.     A City official told Plaintiff: *"the inspection report shows the tunnel is in good condition and safe."* (See Exhibit B, safety report and City acknowledgement).

23.     In response to a *subpoena duces tecum* served in *BHRA v. City et al.,* the present Defendants National Geographic provided Plaintiff with some documents.

24.     At least one such document reveals what appears to be an admission of liability by Defendants— a statement suggesting that Defendants have done *something* to cause the City to shut Plaintiffs' access to the tunnel. (See i.e. Exhibit C, p.1: *"Bobs lost his livelihood in part - due to [national geographic television]. He's a live wire and will go public with that."*; p.2: *"we hold some responsibility"*).

25.     Upon information and belief, Defendants did *something* to cause the City of New York to shut Plaintiff out of the tunnel.

26.     Further, the documents show Defendants were in fact engaging in a pattern of excluding Plaintiffs from its own locomotive expedition. (See i.e Exhibit C: *"We have to decide what Bob's role will be the day we drill the bore holes - there is no way to keep this guy away or keep him quiet."* ).

27.     After the City's locking Plaintiff out of its tunnel, Defendants National Geographic took the position Plaintiffs' project was "a National Geographic project."

28.     The scope of Defendants taking liberties with Plaintiffs' project was further discovered by Plaintiff.

29.     To start, Defendants did not tell Plaintiffs that their engineer, Sam Harris, applied to the "National Geographic Expeditions Council" for an "expedition grant" to fund a project of his own.

4

30. This was surprising because Plaintiffs thought Sam Harris was just an employee of Defendant and was there to assist Plaintiffs.

31. Upon information and belief, National Geographic, along with their engineer, was claim jumping Plaintiffs' project. (See Exhibit D, where Sam Harris makes no mention of Diamond or his organization).

32. Without consulting Plaintiffs, Defendants allowed their engineer to use Plaintiffs' information and in order to usurp Plaintiffs' project.

33. Further, the Defendants' archaeologist, Lynn rakos, was also believed to be just an employee[3] of National Geographic that was supposed to be assisting plaintiff.

34. Upon information and belief, Ms. Rakos is and at all times was a Professional Archaeologist of New York City ("PANYC") member and further, was or is PANYC president.

35. PANYC is closely aligned, if not composed of some of the same people as, the City of New York's Landmarks Preservation Commission ("LPC").

36. Historically, both PANYC's and the LPC's longtime goal has been to get Diamond out of the tunnel.  See i.e. from Exhibit E, notes from PANYC's "Action Committee" :

> *"Friedman, Baugher-Perlin and Mark Kodak, all of the*
> *LPC have been involved, and the City Dept. of Transportation will*
> *rescind permission to Diamond for entering the tunnel...  it was*
> *urged that people from HAER, SIA, or others with expertise record*
> *the tunnel and its contents."...*

---

[3] Plaintiff does not now know whether Defendant's engineers and archaeologists were employees of National Geographic Society or NGHT LLC.

"*Baugher-Perlin and Friedman of the LPC arranged to have the manhole granting access to the tunnel welded shut.*"...

"..*[Diamond] has allegedly claimed that the letters from the LPC refusing him access to the tunnel are forgeries. Baugher [of the LPC] suggested that PANYC submit a proposal to the LPC on what should be done with the tunnel... Klein should write a letter to DOT, applauding their action in sealing the tunnel, and explaining why it was important this it be done.*"

37.     Defendants had planned, well before even entering an agreement with Plaintiffs, to prepare and submit all research, field work, and results to the LPC and/or "selected other interested parties."

38.     Upon information and belief, Defendants did share all the information shared by Plaintiffs with the LPC and/or other third parties.

39.     Likewise, upon information and belief, Defendants did share all research, field work, and results with the LPC and/or other third parties.

40.     Defendants also intended to do the same with any artifacts that they may have found— they intended to catalogue or otherwise hand over these articles to the LPC or some other third party, to the exclusion of BHRA.

41.     Defendants had an "artifact sampling plan" in coordination with the LPC.

42.     Further, it was discovered that a January 2011 magnetometer reading confirmed Diamond's pinpointing of the locomotive.

43.     Defendants did not share these magnetometer findings with Plaintiffs either.

44.     Upon information and belief, if Defendants were not served with a *subpoena*, these findings would not have been shared with Plaintiffs.

45.     Upon information and belief, Defendants did share these findings with the LPC and other third parties.

46.     Upon information and belief, other fruits of Plaintiffs' labor are in Defendants' possession.

47.     Further, upon information and belief, Defendants shared these "fruits" with third parties, but not Plaintiff.

48.     At all times the engineer and archaeologist and any other third parties were under the control of Defendants.

49.     Defendants controlled the scope of how the work was done.

50.     Further, Defendants controlled all communications between Plaintiffs and the engineer, archaeologist and other members of Defendants' team.

51.     Likewise, as alleged, Defendants controlled the flow of all information to Plaintiffs.

## FIRST CAUSE OF ACTION

### {Misappropriation & Unfair Competition}

52.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 51, as though it were fully set forth at length herein.

53.     Defendants went above and beyond the scope of any rights given to them by Plaintiffs.

54.     The collection of documentation, articles, technical information, mapping, etc. shared with Defendants pertaining is valuable, the product of Plaintiffs' hard work

and research, and even to the extent some of that material may be in the public domain, was painstakingly compiled and edited by Plaintiff (the "Information"). This Information is Plaintiffs' property.

55.     Defendants have used the Information far beyond scope of any rights given by Plaintiffs to use the Information.

56.     Further, upon information and belief, Defendants have shared the Information with other "selected" third parties..

57.     Defendants misappropriated Plaintiffs' materials without the permission and as a result Plaintiff has lost a competitive edge.

58.     Further, upon information and belief, Defendants are now in possession of the Information and have gathered further information based on Plaintiffs' information.

59.     Further, Defendants misappropriation and wrongful dissemination of Plaintiff's materials have incentivized the City of New York to exclude and continue exclude Plaintiffs from the tunnel.

60.   As a result of Defendants misappropriation, Plaintiffs have suffered $15 million in damages.

## SECOND CAUSE OF ACTION

**{Tortious Interference With Prospective Economic Advantage or Contract}**

61.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 60, as though it were fully set forth at length herein.

62.     Plaintiff BHRA had a contract with the City of New York to run a museum and exhibition space in the Atlantic Avenue Tunnel, and Defendants knew about this contract.

63.     Upon information and belief, Defendants, perhaps through their archaeologist or engineer, tortiously interfered with this contract by directing or otherwise influencing the City of New York to exclude plaintiff from accessing the tunnel and being there for the finding of any potential artifacts.

64.     Upon information and belief, Defendants wrongfully misrepresented and misled the City to believe the tunnel was somehow unsafe and unfit for use a museum space.

65.     Further, upon information and belief, Plaintiff did so with the hopes that it would be able to enter the tunnel to the exclusion of Plaintiff and assert site control.

66.     If Defendants' engineer and archaeologist and other third parties were not employees of Defendants, Defendants had sufficient authority over them.

67.     As a result of Defendants' tortious interference, Plaintiffs have lost their state-chartered museum, and have suffered damages in the amount of $15 million.

## THIRD CAUSE OF ACTION

### {Negligence}

68.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 67, as though it were fully set forth at length herein.

69.     Defendants failed to exercise reasonable care by doing *something* they seem to admit liability for.

70.     Including or additionally, upon information and belief, Defendants failed to exercise reasonable care by keeping both Plaintiffs and the City's DOT "out of the loop," by messy communications with the City of New York, by not following correct procedures or going through the proper channels when applying for City permits, by forging Diamond's signature when applying for such permits, by "going over" certain people's heads, or for other reasons not yet known, Defendants have failed to exercise reasonable care and have somehow invoked the ire of the City of New York causing them to deny Plaintiff's access. (See Exhibit, C, i.e. *"we hold some responsibility"*).

71.     Upon information and belief, Defendants failed to exercise reasonable care by negligently leading the City of New York to believe that the tunnel was somehow unsafe, or by allowing their engineer or archaeologist or third party under their control to make such misrepresentations.

72.     Defendants failed to exercise reasonable care by sharing Plaintiffs' valuable Information with third parties without license.

73.     Defendants failed to exercise reasonable care by failing to properly screen the engineer and archaeologist they dealt with.

74.     As a result of Defendants' negligence, Plaintiffs have lost their state-charted museum.

75.     As a further result, Defendants have incentivized the City of New York to keep Plaintiffs out of the tunnel.

76.     Because of Defendants' negligence, Plaintiff suffered damages in the amount $15 million.

## FOURTH CAUSE OF ACTION

### {Breach of Confidential and Fiduciary Relationship}

77.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 76, as though it were fully set forth at length herein.

78.     Plaintiffs had a relationship of trust and confidence with Defendants, and put its confidence in the integrity and fidelity of the Defendant, by trusting Defendants and bringing them on board Plaintiffs' locomotive project.

79.     Defendanst abused that trust, and breached their duty by their words, deeds and omissions.

80.     As a result of Defendants' breach, Plaintiff has suffered damages in the amount of $15 million.

## FIFTH CAUSE OF ACTION

### {Actual and/or Constructive Fraud}

81.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 80, as though it were fully set forth at length herein.

82.      Upon information and belief, Defendants planned from the outset to take or otherwise hand over control of the project.

83.     Likewise, upon information and belief, Defendants planned from the outset to take or otherwise hand over the fruits of Plaintiffs' research.

84.     Defendants kept silent in order to mislead Plaintiff into agreeing to produce a documentary so that they could avail themselves of Plaintiffs' Information.

85.     Defendants further kept silent during while executing their plans.

86.     Defendants kept quiet about Sam Harris and his "expedition."

11

87.     Defendants were silent on their intentions to hand over all work and research to the LPC and other third parties.

88.     By their acts, deeds, and omissions, Defendants breached the confidential relationship they had with Plaintiffs.

89.     Defendant had a duty to inform Plaintiff of the true scope of their actions and intentions.

90.     Plaintiffs justifiably relied on Defendants misrepresentations because they never expected National Geographic would take advantage of a small non-profit.

91.     Plaintiffs would not have agreed to work with Defendants or would have otherwise ousted Defendants from the project if the scope of Defendants' actions were known to Plaintiffs.

92.     Plaintiffs relied on Defendants, to their detriment.

93.     As a result of Defendants' actions and omissions, Plaintiffs were injured in the amount of $15 million.

## SIXTH CAUSE OF ACTION

### {Reckless Infliction of Emotional Distress}

94.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 93, as though it were fully set forth at length herein.

95.     Defendants acted outrageously by shutting Plaintiff Diamond out of his own project.

96.     Defendants acted without decency by claim jumping the locomotive Diamond discovered, and sharing all the Information and findings with everybody but Diamond.

97.     Defendants acted with substantial disregard of the probability that Plaintiff Diamond would suffer emotional distress, knowing that he had devoted his life to this project.

98.     As a result of their actions Diamond was humiliated and suffered extreme mental anguish and distress and great pain.

99.     Defendants should pay damages in the amount of $1 million dollars.

**WHEREFORE,** plaintiff requests relief as follows:

A.     $15 million in compensatory damages due to Defendants misappropriation, tortious interference, negligence, breach of confidential/fiduciary relationship, and fraud;

B.     $1 million dollars in damages for infliction of mental distress;

C.     An order enjoining Defendants from laying any claim towards the locomotive which Plaintiffs discovered;

D.     An order enjoining Defendants and from further sharing disseminating or otherwise misappropriating Plaintiff's materials;

E.     An order enjoining the Defendants permanently and during the course of this action from in any manner proceeding with the locomotive project;

F.     An order directing Defendants return all of Plaintiffs' Information;

G.     An order directing Defendants to surrender to Plaintiffs any findings, notes, research, results, and artifacts made or found during Defendants' involvement in the locomotive expedition;

H.     A jury trial on all issues triable;

13

I.      An award of plaintiffs' reasonable attorneys' fees, expert fees and other

reasonable costs and expenses; and

J.      Such other and further relief as the Court deems proper.


Dated: Brooklyn, New York
       November 24, 2014

**GABRIEL SALEM**
2739 Strickland Avenue
Brooklyn, New York 11234
(917) 753- 8511
gabriel@salemandco.com
*Attorney for Plaintiffs*
*Brooklyn Historic Railway Association*
*& Robert Diamond*


**TO:**
**NATIONAL GEOGRAPHIC SOCIETY**
1145 17TH STREET, N.W.
WASHINGTON, DISTRICT OF COLUMBIA, 20036

**NGHT LLC**
1145 17TH STREET, N.W.
WASHINGTON, DISTRICT OF COLUMBIA, 20036

14

# Exhibit ___

EXHIBIT A

643-2051



**HOWARD GOLDEN**
**PRESIDENT**

## The City of New York
## President of the Borough of Brooklyn
### BOROUGH HALL
### BROOKLYN CIVIC CENTER
### BROOKLYN, N. Y. 11201

June 12, 1980

Mr. Robert Diamond
599 East 7th Street
Brooklyn, New York   11218

Dear Mr. Diamond:

    Ms. Mary Taintor, of my staff, has advised me that you
have done extensive research on a train tunnel under Atlantic
Avenue which contains a train from 1830 with a wood burning
engine.

    Given your deep involvement in Brooklyn history, I would
like to invite you to join my History Advisory Committee.  The
History Advisory Committee is comprised of Brooklynites active
in local history and local historical societies.  By sponsoring
projects to promote Brooklyn history and by creating a link
among our many local history societies, the Committee focuses
community attention on our fascinating heritage.

    I have requested Mr. Donald Simon, Chairperson of the
History Advisory Committee to write to you inviting you to the
Committee's next meeting.

    We look forward to working with you on promoting Brooklyn
history.

Sincerely,

Howard Golden

{1}

# *BROOKLYN HISTORIC RAILWAY ASSN.*

**599 E. 7th Street, Brooklyn, New York 11218**

**tel. 718—941—3160**

**Robert Diamond**
*President*



*Tunnel as it appeared in 1844.*

October 25, 1991

FOR IMMEDIATE RELEASE

On Saturday October 26, the Brooklyn Historic Railway Assn. will
be excavating the final sealed off section of the Atlantic Avenue
railroad tunnel, built in 1844 and sealed up in 1861. Documentation
shows that this never before seen (atleast in this century) section
of tunnel contains a wood burning steam locomotive built in the
1830's.

Test borings completed last Wednesday confirm the location of the
tunnel portal, and also indicate a "wooden object" buried below the
street,within the tunnel. Construction services are being provided by
two local contractors, with the cooperation of the New York City
Department of Transportation
The excavation will take place on Atlantic Avenue between Hicks Street
and Columbia Street. Work will start between 9 and 9:30AM Saturday.

For more information contact: Bob Diamond, 718-941-3160.

-30-

{2}

Exhibit ___

**EXHIBIT  B**



**LMW Engineering Group, LLC**                                    WWW.LMW-ENG.COM

2539 Brunswick Ave. Linden, NJ, 07036            Tel.(908) 862-7600  Fax(908) 862-8998

March 25, 2009

BROOKLYN HISTORIC RAILWAY ASSOCIATION
599 E 7th Street, Suite 5A
Brooklyn, NY 11218

ATTN.:            Robert Diamond, President

RE:               Atlantic Avenue Tunnel,
                  between Boerum Place and Columbia Street

SUBJECT:          Structural Integrity Evaluation

Dear Mr. Diamond;

Pursuant to your request, we have performed an evaluation of the structural integrity of the referenced tunnel structure, based on visual inspection tour of the tunnel site, and review of reports of previews evaluations performed by others. This letter-report presents the results of our evaluation.

The inspection tour of the tunnel was performed by our senior engineer, Mr. Tony Onyeagoro, P.E., in the afternoon hours of Wednesday, March 25, 2009, assisted by one of our associates. Access and egress to the site were through a manhole located at the middle of the roadway, intersection of Atlantic Avenue and Court Street, Borough of Brooklyn. Visibility in the tunnel was generally subdued, but details of the structural elements were clearly observable using a flash light. Select, typical portions of the structure details were captured using flash-enabled *Canon PowerShot A540* camera.

The tunnel structure consists of a masonry block arched dome upper section, supported on either side by a wall made of varying-size stone or rock quarry, embedded in a matrix of very strong grout mix. The composition of the structural elements is relatively consistent for the entire length of the tunnel. Evidence of removed rail lines and ballasts are observable through out the general grade of the tunnel, which is firm with no sign of moisture or subsidence. The general condition of the tunnel structural elements, relative to previous reports, is impressively devoid of any sign of deterioration. All masonry block units appear to be intact, with no visible loosening of joints. Similarly, there was no observable loss of filler materials within the walls' stone matrices.

Accordingly, in concurrence with the findings of previous evaluations, please be advised that:

1. The tunnel structural members were inspected by our engineer.
2. The load carrying capacity of the tunnel is sufficient to support the anticipated loading (overburden and live load).
3. The non-load carrying members are secure.
4. The structural integrity of the tunnel is sound and has not been compromised by aging.



5. The tunnel can be considered safe under its current use for visitors and tourist attraction.
6. There is no evidence that any form of maintenance or repair work is necessary at this stage.
7. The tunnel can be safely, with relatively minimum rehabilitation effort, mostly esthetic, be utilized as a museum or similar facility.
8. In summary, the tunnel, as inspected by us, is a safe and sound structure.

We appreciate the opportunity to provide this service for you, and look forward to continuing involvement in this extraordinarily noble venture. If you have any questions regarding this letter-report, please feel free to call us.

Very truly yours,
LMW ENGINEERING GROUP, LLC

Tony C. Onyeagoro
Senior Project Engineer
NYS P.E. License # 063593





{3}



"The Tunnel is in good condition and safe."

**From:** "Berenblit, Emma" <eberenblit@dot.nyc.gov>
**To:** Robert Diamond <rdiamond@brooklynrail.net>
**Cc:** "Koenig, Anne" <akoenig@dot.nyc.gov>; "John, David" <djohn@dot.nyc.gov>
**Sent:** Fri, March 27, 2009 10:58:07 AM
**Subject:** RE: Completed Atlantic Avenue Tunnel Report
Dear Robert

Thank you for sending us completed inspection report for Atlantic Avenue tunnel. Inspection report shows that the tunnel is in good condition and safe. You may continue usage of the tunnel. However you need to comply with all applicable laws, rules and regulations when conducting operations including obtaining any and all permits required by the City of New York. If you close streets in order to access the tunnel, you need to obtain the requisite street closing permits from DOT.

**From:** Robert Diamond [mailto:rdiamond@brooklynrail.net]
**Sent:** Thursday, March 26, 2009 7:39 PM
**To:** Berenblit, Emma
**Subject:** Completed Atlantic Avenue Tunnel Report

Dear Emma, please find attached the completed preliminary structural report on the Atlantic Avenue tunnel. According to the report, this is a safe and sound structure, please give special attention to items 5 and 6 in the report. Also attached are the photos.

I assume we can now proceed with our usual access to the tunnel.

Thanks again for your assistance and understanding in this matter.
Bob Diamond

*********************************************************************************************

This message and any attachments are solely for the individual(s) named above and others who have been specifically authorized to receive such and may contain information which is confidential, privileged or exempt from disclosure under applicable law. If you are not the intended recipient, any disclosure, copying, use or distribution of the information included in this message and any attachments is strictly prohibited. If you have received this communication in error, please notify us by reply e-mail and immediately and permanently delete this message and any attachments.

Thank you.


NYC - Department of Transportation

*********************************************************************************************

{4}

Exhibit ___

**EXHIBIT C**

**The Tunnel convo 1/18/11**

-Plan to gain access to the tunnel for the final 3 to 4 shoot days.
-Status of engineering plan and costs for our Phase 4 options (what are the steps)
-Bob Diamond's request for final payment
-Bob Diamond - how to handle for remainder and press
-Streamline who is the go to person from NGT?
-Ethics – Bob's lost his livelihood in part – due to ngt. He's a live wire and will go public with that.

We have to decide what Bob's role will be the day we drill the bore holes – there is no way to keep this guy away or keep him quiet.  Let Russell know ahead of time.

Bill will write to Bob – explain that ngc is crafting a release.  Peter can show him the image.

Sam Harris: 15 foot x 7 foot iron object down there and I don't know what else it could it.

Russell:
Does not want – bob gets images, or is there
Bob shouldn't be there.
He wants the pictures to be released the day before broadcast – not before then.
Russell will threaten to sue Bob –
He thinks this will hit the papers only once.
Peter disagrees – build the story – hold out for the details.

What do we want from the DOT:

1. permission to have access for 3 to 4 shoot days in the tunnel in Feb or March
2. Allow us the permits necessary to complete the engineering study of the find – either to drill several small bore holes (4 inches) or one large (24 inches) at street level.  This will allow confirmation of the discovery.
3.

Options
**No Bob/No further access to Tunnel:**
You could license other footage of the tunnel (not HD) but the film suffers.  Worth waiting to get access so that we can shoot the real thing.

Awaiting update from Sam on engineering options.

**No Bob/Access to tunnel**
Bob's master interview in Tunnel
Bob's involvement in current expedition: what will we find, working with team up on the street, in the bar (Montero's) with The bartending skepticism

{1}

The discovery scene with Bob and Sam the engineer
Putting marks on the ground where they think the train is (above ground)
-from an arc standpoint...this could be the end of the film
Bob at home (very strong, passionate interview)
Bob ripping up document from DOT, Bob is obsessed
Bob's sidekick Greg
Bob doing research, showing us materials about search for train

**Train Expedition scenes:**
Utility mapping (short scene) idea of marking the ground, painting lines on At Ave
Nighttime huddle – what are we going to do
Bringing out the various equipment – the magmometer. (short scene but could be
expanded into more science detail),
Bob watching as engineering team work.
Moment of discovery under the BQE – seeing the data showing that there is
something iron inside the tunnel.
Localized points using gps, wide shots from a building above,
Bob explaining that this is where he thought it was: article from 1911, a sailor said
he saw it from his apt window when he was a kid...he calculated where the house
was and said – this is where it will be...GREAT MOMENT@

New York Public Library: re-cre of original search for the train
Interviews: people expressing skepticism (two historians)

**What we are missing:**
No brainstorming, no Coney Island scene.
No scenes of Bob in or entering the tunnel – no show and tell

**Bob Diamond tells us that the FDNY:**
Around Christmas, Bob Diamond received a list from FDNY, saying that he was shut
down unless certain safety changes were made, including building a metal staircase
($4300).  Bob then tells us that City Hall says these changes.



**Ethical Question:**
Bob was doing film screenings – but we were also shooting in the tunnel with Bob.
Then he gets shut down.  We hold some responsibility.

DOT called Bob and Bill to ask what we were doing – and to reiterate that we didn't
have permission to dig the tunnel.  Bill confirmed that we were not doing anything
digging – only filming an interview.

Then the DOT shut down all access to the tunnel.

Bob has continued to move forward with a lawsuit against the DOT – saying that it's
breach of revocable licence, etc for them to shut him out of the tunnel.

{2}

Exhibit ____

**EXHIBIT  D**



**Firm      Services      Projects      Contact**

**S. HARRIS LTD.**
ARCHITECTURAL TECHNOLOGY

**ATLANTIC AVENUE TUNNEL**

**LOCATION**
**Brooklyn, New York**

Now an abandoned railroad corridor under the busy Atlantic Avenue in Brooklyn, this tunnel was originally constructed in 1844, providing below grade passage for the Long Island Rail Road trains. Considered an engineering achievement for its time, some have claimed it to be the world's first subway tunnel.

By the fall of 1861, the tunnel had become obsolete and was shortly thereafter abandoned, its ends sealed and filled. Since that time, the tunnel has become the object of legend and local folklore, rumored to have sheltered pirates, moonshiners, and spies. Among these rumors, it also allegedly houses an historic locomotive from the 1830s. Obsolete and old at the time the tunnel ends were filled, the locomotive is said to have brought fill into the tunnel and was left there rather than being scrapped. Other sources, literary references, and one oral account support the notion of the locomotive's existence. S. Harris Ltd. and a team of consultants are in the process of conducting an archaeological investigation to determine if the rumored locomotive is in fact buried inside the Atlantic Avenue Tunnel.

S. Harris Ltd. was selected as a National Geographic Expeditions Council Grant recipient for the investigation and exploration of this tunnel, and has acted as Project Manager and Structural Engineer for the investigation and excavation work. This project will be shared with a global audience as a documentary film upon completion of the project in the spring of 2011.

▶ National Geographic Expeditions Council Grant

**http://www.sharrisltd.com/Projects/Individual%20Project%20Pages/Atlantic%20Avenue%20Tunnel.html**

{1}



Firm    Services    Projects    Contact



**National Geographic Expeditions Grant**

In the fall of 2010, S. Harris Ltd. was selected as a National Geographic Expeditions Council Grant recipient for the investigation and exploration of the Atlantic Avenue Tunnel in Brooklyn, New York. The tunnel is rumored to house an historic locomotive that was built in the 1840s and buried there in 1861, when the tunnel was closed to the public and sealed. This project is an ongoing exploration, and to date, S. Harris Ltd. has acted as Project Manager and Structural Engineer for the investigative work.  This project will be shared with a global audience as a documentary film upon completion of the project.

*"The Expeditions Council consists of representatives from National Geographic editorial divisions (magazines, television, books, and so on) who review and vote on grant applications and an advisory board of external consultants.*

*The Expeditions Council is editorially driven; projects must have the potential to yield compelling stories and images. Applications are also judged on the qualifications of applicants and their teams and on the merit and uniqueness of the project.*

*In addition to financial support, the Expeditions Council offers its grantees the opportunity to work effectively with the National Geographic's many divisions. Grantees are therefore able to share the results of their expeditions with National Geographic's global audience."*

▶ Atlantic Avenue Tunnel

About | Services | Projects | Contact | Links | Location | Home

http://www.sharrisltd.com/About/Office%20Newsletter%20Pages/National%20Geographic%20Expeditions%20Council%20Grant.html

{2}

Exhibit ___

EXHIBIT  E

PANYC General Membership Meeting     23 March 1983    New York University

Minutes

Salwen called the meeting to order at 7:30 p.m.

Secretary's Report  The minutes from the January meeting were accepted
with the correction that Congressman Bennett's name be spelled correctly.

Treasurer's Report   As the treasurer was not present, no report was
given.

President's Report  Salwen said that he had enjoyed being president, and
hoped that the new president would enjoy it as well.  The rest of his
report was raised in the body of the meeting.

Committee Reports

Election Committee  Salwen reported the results of the PANYC election:
President, Joel Klein; Vice-President, Sydne Marshall; Secretary,
Diana Rockman; Treasurer, Joan Geismar; executive board members: Bill
Askins, Anne-Marie Cantwell, Celia Orgel, Arnold Pickman, Nan Roth-
schild, and Bert Salwen (ex officio).

Action Committee  Although Geismar reported that the committee had not
met, she raised several issues.  She had followed up on a letter she
had written earlier about No. Brothers Island, and had gone to visit
the City Dept. of Real Property.  She reported that the City is aware
of our concern about the island, but that the project is currently
dormant.  In regard to the looting at the Bartow-Pell House, Geismar
plans to visit the site with Ed Friedman and Baugher-Perlin from the
LPC and Frank Papys from the Bronx division of the Dept. of Parks.
She had also heard that artifacts from this site are on sale in Vir-
ginia.  She urged that PANYC work to change the Parks Department's
attitude toward its archaeological sites.

Salwen raised the problem of the destruction of the 1844 tunnel in
Atlantic Avenue in Brooklyn.  He had written to Kent Barwick, chairman
of the LPC, in February to urge the commission to protect this site, as
it is an important historic resource.  He has not heard from Barwick
yet.  Friedman, Baugher-Perlin, and Mark Kodak, all of the LPC, have
been involved, and the City Dept. of Transportation will rescind per-
mission to Diamond for entering the tunnel, and will weld a manhold in
place to keep the tunnel shut as a temporary measure.  It was urged
that people from HAER, SIA, or others with expertise record the tunnel
and its contents.

Public Program Committee  Klein announced that the public program will
be held on May 7 at 1 p.m. at the Museum of the City of New York.

Newsletter Committee  Klein read Marshall's report.  Sixty-four copies
of the Newsletter were mailed out prior to the meeting.  Twenty-nine
of these were sent to members, seven to subscribers, one to our honorary
member, and 27 as complimentary copies.

Research and Planning Committee  No report was given.

Legislative Committee  Salwen reported that the National Park Service
has been reorganized for the fourth time in the recent past.  It has
combined its sections on history, archaeology, anthropology, and preser-
vation, with Jerry Rogers as head.  The goal of this reorganization is
unclear at this time; the Coalition for National Parks will meet March
25, and Salwen said he would find out what transpired at this meeting.
This reorganization is potentially dangerous, because the people involved
oversee the National Register, the State procedures for dealing with
preservation, etc.

PANYC General Membership Meeting      18 May 1983     New York University

MINUTES

Klein called the meeting to order at 7:50 p.m.

<u>Secretary's Report</u>  The minutes from the March meeting were accepted.

<u>Treasurer's Report</u>  Marshall presented Geismar's report, as Geismar was not present.  Geismar is still awaiting a letter from Sterud authorizing her use of the account.

<u>President's Report</u>   Klein's report was raised in the body of the meeting.

Committee Reports

<u>Newsletter Committee</u>  Marshall reported that 67 copies of the Newsletter were sent out prior to the meeting.  Thirty-one of these were sent to members, 8 to subscribers, 1 to our honorary member, and 27 as complimentary copies.  Winter suggested that copies be sent to the LIHS and the NYHS as well.  Marshall said that she will call both of these societies to be sure they are interested in receiving the Newsletter before adding them to the mailing list.

<u>Action Committee</u>

Rockman introduced a <u>New York Times</u> article on <u>bottle collecting</u> which mentioned digging for bottles.  Klein and Winter (the latter as a representative of AIA) both agreed to write to the editor of the <u>Arts and Leisure</u> section protesting this, with copies also to be sent to the publisher and the author of the article.



Klein reported on the status of the Atlantic Avenue Tunnel.  Baugher-Perlin and Frideman of the LPC arranged to have the manhole granting access to the tunnel welded shut.  Unfortunately, however, as no one was present at the welding who knew the precise location of this particular manhole, it is unclear if the proper manhole was sealed.  Klein offered to make a field visit and check on this.

Winter reported on the proposed <u>excavations in Canarsie</u> and said that DeBose is not planning to dig this summer.  Bankoff has been working with DeBose, and both Winter and Bankhoff will go with De-Bose to visit the site in July.

Klein reported on the <u>field school</u> advertised in the New School summer catalogue.  This course will be taught by the Rev. John Piet and will include the excavation of a prehistoric site in New Jersey.  Rock-man will send a letter enclosing the AAA field school guidelines to one of the deans of the New School, and Klein will both contact the dean by phone and call Lorraine Williams of the NJSM.

Baugher-Perlin reported on the <u>Bartow-Pell</u> site in the Bronx.  Geismar, Friedman, and Papys from the Bronx Parks Department visited the site and noted that though the site is extensive, it has been heavily potted.  After some discussion, it was decided that Klein would

PANYC General Membership Meeting   21 September 1983   New York University

<u>MINUTES</u>

Klein called the meeting to order at 7:50 p.m.

<u>Secretary's Report</u>   The minutes from the May meeting were accepted.

<u>Treasurer's Report</u>   Geismar reported that, because of difficulties in transferring PANYC's account from her predecessor, she has not been re-ceiving statements from the bank.  However, she has learned that be-cause PANYC's is a business account, the bank charges $10. a month simply to keep the account active.  So far, we have lost $44.85 in fees since she became treasurer.  It was announced that the Board had decided that a joint personal NOW checking account will be established for PANYC in Geismar's and Klein's names, and that they will reimburse them-selves out of the interest on the account for any extra taxes they may have to pay.  Geismar reported that she estimates that there is ca. $743.27 in the account now.

<u>President's Report</u>   Klein reported that he has checked on the status of the manhole granting access to the Atlantic Avenue Tunnel, and that it has in fact been sealed shut.
He also contacted DeBose, who is planning the excavations in Canarsie, and invited him to attend this meeting.  Unfortunately, DeBose did not attend.
Klein reported that Rockman wrote to Dean Ira Katznelson of the New School about their summer <u>field school</u>, and that the letter was for-warded to Dean Allen Austill of the Adult Division, where the course was being offered.  To date, Austill has not responded to the letter. It was decided that Rockman should send a copy of the original letter to the President of the New School with a new letter saying that we had not had a reply, and would appreciate his looking into the situation. Copies of these letters will also be sent to Dean Austill.
Klein has written to the <u>new LPC Chairman</u> to welcome him and to express the hope that PANYC will be able to develop as good a working relation-ship with him as we had with his predecessor, Kent Barwick.
He has also written to Henry Stern of the Parks Department in order to arrange a meeting.
Klein reported that PANYC did not participate in the <u>Olmsted Conference</u>, as we contacted them too late to be included.

<u>Committee Reports</u>

<u>Newsletter Committee</u>   Marshall reported that 70 copies of the newsletter were prepared, and that 33 of these were sent to members, 8 to sub-scribers, one to our honorary member, and 28 as complimentary copies. Rockman will send out reminders to newsletter subscribers who have not renewed their subscriptions.



<u>Action Committee</u>   Geismar reported that Diamond, the amateur who worked at the Atlantic Avenue Tunnel, has allegedly claimed that the letters from the LPC refusing him access to the tunnel are forgeries.  Baugher suggested that PANYC submit a proposal to the LPC on what should be done with the tunnel.  Klein reported that a letter had already been

sent to Diamond, and that the AIA, PANYC, and the LPC had all offered
to work with him. It was decided that Klein should write a letter to
DOT, applauding their action in sealing the tunnel, and explaining why
it was important that it be done. Copies of this letter will be sent
to the local Brooklyn police precinct, Brooklyn Union Gas, Con Edison,
the LPC, and the local community planning board.

Baugher reported that a utility trench had been excavated at the Conference
House Site on Staten Island, a landmark site, with no prior archaeological
testing. This site belongs to the City, is administered by the Parks
Department, and is leased from the City and run as a house museum.
Baugher had tested the area where the trench was originally supposed
to go, but the plans had been changed. As the Parks Department administers
several house museums and as many archaeological sites are located on
park grounds, this raised the question of dealing with the Parks De-
partment in general. For example, it was also reported that a woman
was digging in Inwood Hill Park. Salwen said that a memorandum of
agreement between the LPC and the Parks Department is needed. Klein
will write to Henry Stern of the Parks Department again, and will call
him a week later to arrange a meeting. Salwen (as an individual and
not as PANYC's representative) will call Lenore Norman of the LPC to
emphasize the magnitude of the problem with the Parks Department.

Rothschild reported that the N.Y.C. Bureau of Sewers initiated a re-
quest for a documentary survey in the area where new utilities will
be installed on South Street. However, this request said nothing about
subsequent testing if such were warranted. The excavations for these
utilities were begun in an area which had archaeological potential be-
fore the report was prepared. Rothschild will contact Ruth Ann Knudsen,
the archaeologist who works for the engineering firm which has sub-
contracted this part of the matter, to discuss this matter.

State Plan Committee  Cantwell reported on the State Plan Steering
Committee meeting in Albany on 27 May 1983. After an introductory
session, the meeting was divided into 2 groups to set up study units
for historical and prehistoric resources. In all, 89 such study units
were chosen. As only $5000. and limited time were available, only a
few of these study units were selected for work now. One of these
study units was the industrial period in New York City, and many of
PANYC's members had worked on this project over the summer. Klein
raised strong objections as to how the execution of the state plan
had been organized, particularly stressing that the results of the
steering committee meeting had not been widely distributed through-
out the archaeological community and that the time and money allocated
were not adequate. Salwen, however, said that a good start had been
made, but that more archaeologists should be involved and that the
results should be reviewed by the archaeological community. Orgel
offered to xerox copies of the report prepared for N.Y.C., so that
they can be more widely circulated.

Research and Planning Committee  New directives for research were pre-
sented by the interim committee and the members of PANYC. These in-
clude: 1) the State Plan, as so many members are involved; 2) the

September 10, 1981

Mr. Robert Diamond
599 East 7th Street
Brooklyn, New York 11218

Dear Bob:

Thank you for bringing our attention to the existence of the Atlantic Avenue Tunnel. The two of us that were able to join you for the tunnel expedition shared your enthusiasm. As mentioned during our lunch with you, we are all in agreement that the tunnel is an important landmark in civil engineering and railroad history.

As we discussed, we have been in touch with representatives at the Smithsonian Institution, the National Park Service's Historic American Engineering Record, and the Society for Industrial Archaeology. All are in agreement with us that the tunnel is important and should be recorded (measured drawings and photographs).

As archaeologists we three believe that any excavation within the tunnel would serve no scientific purpose and could result in damage to the historical integrity of the site. Any such damage could cause the tunnel to be rejected as a potential National or City Landmark. We feel, as you do, that landmark status would be important for the tunnel and we are anxious to assist you in any way we can in obtaining such designations.

The costs in time and money for adapting the tunnel for public use, we believe would be prohibitive and would necessitate structural changes that could destroy physical characteristics that contribute to its historic import. The location of the site under Atlantic Avenue and the difficulty in reaching the actual tunnel, has made city officials extremely reluctant to allow even professionals to have access to the tunnel. Any attempt to bring groups into the tunnel (and all the liabilities that that entails) may cause the city to react by permanently sealing up the entire tunnel.

Continued ....

53 PARK PLACE, NEW YORK, N.Y. 10007, PHONE: (212) 732-6677

{5}

September 10, 1981                    Page — 2 —

Mr. Robert Diamond
Brooklyn, New York 11218

        We know that you have done extensive research and
we urge you to prepare a paper for publication in a
professional journal, and we remain willing to assist you
in putting this together.

Sincerely,

Eugene Sterud, Ph.D
Executive Director,
Archaeological Institute of America
Treasurer, Prof. Archaeologists of N.Y.C.

Sherene Baugher-Perlin, Ph.D
Urban Archaeoligist
NYC Landmarks Preservation Commission
Executive Board, Prof. Archaeologists of N.Y.C.

Joel Klein, Ph.D
Senior Archaeologist
Ebasco Services, Inc.
Executive Board, Prof. Archaeologists of N.Y.C.

cc:   Ira Berman
      Lynn Ceci

{6}

LAW OFFICES OF
## JEFFREY L. SHERNOFF
60 EAST 42ND STREET
NEW YORK, NEW YORK 10165

JEFFREY L. SHERNOFF

RICHARD GREENBERG, OF COUNSEL
ABRAHAM GREENBERG, OF COUNSEL

TELEPHONE
(212) 697-0008

September 3, 1981

Mrs. Elsa Diamond
599 East 7th Street
Brooklyn, New York  11226

Re: Atlantic Avenue Tunnel.

Dear Elsa:

In view of my earlier informal involvement in the tunnel project I want to advise you that I have received information that legal steps are possibly being taken by at least two members of the expedition to cause the tunnel to be sealed and to freeze Robert completely out of the picture.

I have been told that two of the archeologists Bob recruited to join the expedition have taken these measures.

I believe that you should review the situation and consider retaining Counsel, other than myself, to fully protect Bob's interests.

I wish both Bob and yourself best of luck for all of your endeavors in the future.

Very truly yours,

JEFFREY L. SHERNOFF

JLS/me
cc.: Mr. Robert Diamond.

{7}



# LANDMARKS PRESERVATION COMMISSION

### 20 VESEY STREET, NEW YORK, NEW YORK 10007

566-7577

To: Richard Diamond

From: Sherene Baugher-Perlin

Date: June 18, 1982

Subject: Brooklyn Rail Tunnel

On May 27, 1982 a meeting was held between Ann Thomas Langford and Joe McNamara of Public Affairs of the Port Authority of NY and NJ, Jim Malone of the Port of New York Authority, Mark Siunarelli of the NYC Transit Authority, Marc Kodack of the NYC Landmarks Preservation Commission and Richard Diamond to discuss Mr. Diamond's discovery, exploration and proposed development plans for a historic Brooklyn rail tunnel.

The tunnel was constructed in 1844 and runs under Atlantic Ave. from approximately Court Street to approximately Furman Street. It was part of a rail line to Boston. It is 17 feet high by 21 feet wide. The arched brick roof is supported at the base on either side by blocks of worked stone cemented together that are six feet thick. It was closed prior to the Civil War. Because it has been sealed since then, wooden ties and other cultural materials are still present although their condition has deteriorated since the tunnel's discovery in 1979.

In the Fall of 1981, The Professional Archaeologists of New York City(PANYC) offered their guidance and assistance to insure that the tunnel and its associated artifacts will not be destroyed and the site will be properly documented before any disturbances occur.

Because the tunnel and its artifacts are a potential State and National Register site, it is imperative that its integrity be protected to avoid any destruction or disruption of this site. Bruce Fullem and Ann Covell of the New York State Office of Parks and Recreation should be contacted regarding the site's eligibility for inclusion on the National Register.

It is recommended that until the assistance of either a qualified professional historic/industrial archaeologist or a professional historic preservationist is obtained, no one be allowed under any circumstances into the tunnel. This expert should immediately assess the conditions inside the tunnel and should be present when any other people are allowed into it. The total number of visitors should be kept to minimum. No modifications of any type should be permitted without proper documentation and review by the City. These conditions will protect the integrity of the tunnel structure and its artifacts. They will also prevent the unauthorized entry and destruction of a unique part of the City's history.

CC: Ann Thomas Lanford
    Joe McNamara
    Jim Malone
    Mark Siunarelli
    Bruce Fullem
    Ann Covell
    Richard Diamond
    Brooklyn Union Gas Company, Public Relations Director

## PLAINTIFFS' VERIFICATION

STATE OF NEW YORK

                 ss:

COUNTY OF KINGS

       ROBERT DIAMOND, being duly sworn, says:

       I am Plaintiff and chairperson of the Plaintiff, the Brooklyn Historic Railway Association, in the action herein: I have read the annexed COMPLAINT and know the contents thereof, and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true. My belief as to those matters therein not stated upon knowledge, is based upon facts, records, and other pertinent information contained in my personal files.

 

ROBERT DIAMOND
Chairperson
Brooklyn Historic Railway Association

DATED: Kings County, New York
       24 day of November, 2014

Sworn to before me

This 24 day of November, 2014

Notary Public
      LEVINE SHMUEL
Notary Public, State of New York
Qualified in Kings County
Reg. No. 01LE4869693
My Commission Expires Sept. 2, 2017

Index No. 511190 | 2014

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**

---

The BROOKLYN HISTORIC RAILWAY ASSOCIATION
and ROBERT DIAMOND

                                                    Plaintiffs,


                    -against-



NATIONAL GEOGRAPHIC SOCIETY and NGHT, LLC.


                                                    Defendants.


---

## SUMMONS AND VERIFIED COMPLAINT

---


**GABRIEL SALEM, ESQ.**
*ATTORNEY FOR PLAINTIFFS*
2739 STRICKLAND AVENUE
BROOKLYN, NEW YORK 11234
(917) 753-8511
gabriel@salemandco.com